**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STEPHANIE DAMADIO ) | |
| 3171 Sudbury Road ) | |
| Cameron Park, CA 95682 ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | |
| ) | |
| DIRK KEMPTHORNE ) | |
| Secretary of the Interior ) | **JURY TRIAL DEMANDED** |
| U.S. Department of the Interior ) | |
| 1849 C Street, N.W. ) | |
| Washington, D.C.  20240 ) | |
| Defendant. ) | |
| _____ ) | |

## COMPLAINT FOR DISCRIMINATION

1.   Plaintiff Stephanie Damadio, by and through undersigned counsel, hereby files this civil action against Defendant Dirk Kempthorne, as head of the U.S. Department of Interior, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. Plaintiff seeks relief pursuant to Title VII and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, for harms caused to Plaintiff when Defendant denied her an accretion of duties promotion to the GS-14 level; refused to select her for the position of GS-301-14/15 Group Manager, Cultural and Fossil Resources and Tribal Consultation Group, despite the fact that her qualifications were superior to those

1

of the selectee; subjected her to a hostile work environment based on her race and national origin (Hispanic), gender (female); and also retaliated against her because of prior EEO activity.

    2.   Plaintiff requests as relief in this Complaint:

        A. Retroactive promotion to the GS-14 position she was denied with full back pay and benefits;

        B. Correction and expungement of Agency records including her personnel records to eliminate discriminatory negative references;

        C. compensatory damages in the amount of $155,000; and

        D. Costs and expenses, including the reasonable attorney fees incurred in bringing this action and the previous administrative complaints.

## PARTIES

   3.   Plaintiff Stephanie Damadio ("Dr. Damadio" or "Plaintiff"), is a Hispanic female, who has been employed since October 16, 2005, as the Senior Program Analyst – Heritage, for the U. S. Department of the Interior, Bureau of Land Management ("Bureau")'s California Office. Beginning in 1994 and for the entire period of the complaints in this action, Dr. Damadio has

2

been employed as the Bureau's National Curator, nationwide lead for museum collections and Director of the Native American Graves Protection and Repatriation Act ("NAGPRA") Program for the Bureau's Headquarters Office in Washington, DC.  Prior to October 16, 2006, she was a D.C. Headquarters employee, although her office was located in Sacramento, California.

4.    Secretary Dirk Kempthorne is being sued in his official capacity only, as head of the U.S. Department of Interior.  His address is U.S. Department of Interior, 1849 C Street, N.W., Washington, DC 20240.

### JURISDICTION AND VENUE

5.    This Court has jurisdiction over this Complaint because it presents a question of federal law. 28 U.S.C. § 1331.

6.    Specifically, this Court has jurisdiction over this Complaint pursuant to 42 U.S.C. § 2000e-5(f)(3), 42 U.S.C. §2000e-16(d), and 42 U.S.C. §1981a.

7.    This Court is the proper venue pursuant to 42 U.S.C. § 2000e-5(f)(3). While Dr. Damadio's office has been located in California since 1996, for all periods relevant to this Complaint her organizational position, responsibilities, and all the supervisors and managers were located in Washington, D.C. The discriminatory acts complained of took place in Washington,

3

D.C.  Furthermore all records, documents, and virtually all the witnesses relevant to this Complaint are in Washington, D.C.

8.  Dr. Damadio filed three formal EEO discrimination complaints in the administrative process between 2003 and 2005, during which time she was a Washington Headquarters employee, which were all on the basis of national origin, gender, and retaliation.  The same organizational units and most of the same individuals were involved in all three complaints.  In all three cases, Plaintiff initially attempted to resolve the issues through informal and administrative avenues.  In all cases she was denied the informal and administrative avenues open to other federal employees and guaranteed by law and thus was obligated to use the EEO process as her only avenue of redress.

## First Formal EEO Complaint

9.  On March 18, 2003, Dr. Damadio timely filed her first formal EEO discrimination complaint, Agency Case No. LLM-03-019, EEOC No. 370-2004-00102X, against the Department of Interior, Bureau of Land Management (hereinafter "Agency" or "Interior").  Plaintiff met all the statutory deadlines for filing this formal complaint.  The discrimination allegations in her first complaint were failure to promote and hostile work environment on the basis of national origin, gender, and

4

retaliation.   The primary allegation in the complaint was the discriminatory denial of her request for promotion based on accretion of duties.  The Agency also accepted for investigation her allegation that she was subjected to additional retaliation by the staff Agency's Human Resources Office in the execution of classification procedures.

10.  After the allegations in this first complaint were investigated, Plaintiff requested an administrative hearing before the Equal Employment Opportunity Commission (hereinafter "EEOC").  On June 1, 2005, EEOC Administrative Judge Richard Furcolo issued Summary Judgment against the Plaintiff, without permitting Plaintiff to pursue discovery on the outstanding issues. The Agency adopted his finding in a Final Agency decision dated July 7, 2005.  On September 12, 2005, the Plaintiff filed a timely appeal of this decision to the EEOC Office of Federal Operations.  That appeal has been pending for nearly twelve months.

### Second Formal EEO Complaint

11.  On March 3, 2005, Dr. Damadio timely filed her second formal EEO complaint, Agency No. LLM-05-016, EEOC No. 100-2006-00024X.  Plaintiff met all the statutory deadlines for filing this formal complaint.

12.  The primary discrimination allegation in her second complaint was her non-selection for the position of Group Manager, GS-0301-14/15, Cultural and Fossil Resources and Tribal Consultation Group, despite the fact that Dr. Damadio's qualifications were far superior to those of the selectee (Carolyn McClellan).   Ms. McClellan became Plaintiff's supervisor and began immediately to participate in intensifying the ongoing hostile working environment.   This formal complaint also contained allegations of this continuing and increasingly hostile working environment and a discriminatory letter of counseling issued by Ms. McClellan.   The complaint was filed on the identical basis as Dr. Damadio's first formal complaint, (i.e., national origin, gender, and retaliation.

13. On September 10, 2005, after more than 180 days had elapsed without the agency investigation being completed for this second complaint, Plaintiff requested a hearing before the Washington, D.C. office of the EEOC.   Despite the request for an EEOC hearing, the Agency conducted an investigation between September 8, 2005 and October 29, 2005. On November 16, 2005, the Report of Investigation was completed without the Plaintiff's participation.   The EEOC Administrative Judge

Richard Furcolo sent an Acknowlegment and Order dated December 7, 2005.

14. On March 2, 2006, the Agency filed a Motion for a Decision Without a Hearing for the second complaint. The Plaintiff filed her Opposition to their Motion on April 7, 2006. While this motion was pending the case was reassigned to the North Carolina office of the EEOC. On August 15, 2006, the Agency's motion was denied by the newly assigned EEOC Administrative Judge Wendell M. Sims. The case is presently pending before AJ Sims.

### Third Formal EEO Complaint

15. On December 23, 2005, Dr. Damadio timely filed her third formal complaint, Agency No. LLM-06-0123, alleging hostile working environment, improper changing of medically certified sick leave to absence without leave, and denial of services by Human Resources based on Dr. Damadio's prior involvement with the EEO process. These allegations seek relief for discrimination based on national origin, gender, and retaliation.

16. The Agency sent two letters to Dr. Damadio acknowledging the receipt of the third formal complaint. The Agency never informed Dr. Damadio whether the complaint had been accepted for

investigation or whether an EEO investigator had been assigned. Plaintiff's numerous attempts to contact the Agency's EEO staff concerning the processing of this case have yielded no additional information. This third formal EEO compliant, Agency No. LLM-06-0123, has now been pending without any action by the Agency for more than 180 days.

17. Dr. Damadio now files this District Court Complaint combining each of these three formal EEO complaints. Pursuant to 29 C.F.R § 1614.105-06 and 407. Plaintiff has properly exhausted her administrative remedies for all three complaints. Therefore each of these formal complaints is ripe for review by this Court. See 29 C.F.R. § 1614.105-06, 407.

## FACTS

### Plaintiff's Background

18. Dr. Damadio is a highly experienced and respected Curator, Anthropologist, and Cultural Resources Management expert, having been the national lead for the Bureau's museum collections management and Native American Graves Protection and Repatriation Act (NAGPRA) programs from 1994 to 2005. Dr. Damadio has remained current and has advanced in her fields of expertise by study and the editing and authoring relevant Agency and Department of Interior manuals and policies, as well as

8

consulting with tribal, governmental, museum and scientific leaders on a variety of issues, and conducting original scholarly, technical, and applied research in her fields. Dr. Damadio graduated from the University of Maryland with a Bachelor of Arts degree (Anthropology and History) in 1972. She received her Masters of Forensic Sciences degree (Law, Anatomy, Pathology, Forensic Anthropology) in 1985 from George Washington University, Washington, DC. She received a Doctorate (Biological Anthropology) in 1993 from the University of Florence in Italy.

19. Dr. Damadio has 31 years of experience as an anthropologist and as a federal employee or consultant. Her relevant experience includes 13 years with the Bureau, 13 years with the Smithsonian Institution, and 10 years as a consultant to the Federal Bureau of Investigation. Dr. Damadio is a member of the American Association of Physical Anthropologists, the American Academy of Forensic Sciences, the Society for American Archaeology, and the American Association of Museums.

20. As the National Curator and Director of the NAGPRA Program, Dr. Damadio had been responsible for the technical supervision, oversight, and conveyance of assignments on a continuing permanent basis to 180 Bureau employees nationwide,

9

most of them GS-12s and GS-13s. She provided technical oversight to over one hundred and fifty non-federal museums and curation facilities nationwide holding Bureau collections. The policies she formulated effected all employess in the Bureau as well as the curation facilities nationwide. She has been an Associate Professorial Lecturer at George Washington University in the Department of Forensic Sciences, has provided lectures, seminars, and training at the FBI Academy and Laboratory in all aspects of forensic anthropology, and taught forensic anthropology seminars at the Smithsonian Institution. Dr. Damadio is a nationally and internationally recognized and sought after expert in all of her fields of expertise and teaches in the Fundamentals for Managing the Cultural Heritage Program at the National Training Center, Phoenix, Arizona.

21. Dr. Damadio is fluent in four languages in addition to English, specifically Italian, Spanish, French, and Arabic. She has conducted extensive archaeological field work in areas as diverse as Italy, the Dominican Republic, Yemen, Jordan, Peru, and Ecuador. She also has published extensive original research in the fields of physical, biological, forensic anthropology, and archaeology and museum collections management. Dr. Damadio has received outstanding performance appraisals and numerous

performance awards as well as research grants.

### Failure to Promote Based on Accretion of Duties

22. From 1994 through October 2005, Dr. Damadio, was employed as the Bureau of Land Management's (BLM) National Curator, GS-13. Dr. Damadio was organizationally located in the BLM Washington, D.C. Headquarters Office; however, her office was in Sacramento, California. Beginning in 1999, Dr. Damadio pursued conversations with her supervisor, Ms. Marilyn Nickels, a white female, concerning a promotion to the GS-14 level through accretion of duties. On numerous occasions during that period, Dr. Damadio was repeatedly assured by Dr. Nickels (now retired) that her job performance and her duties as National Curator were at the GS-14 level.

23. Instead of taking any action, Dr. Nickels provided a variety of reasons not to pursue the reclassification of Dr. Damadio's position and duties. For example, Dr. Nickels stated that the "timing was not right" or that "this Administration does not like accretion of duties promotions at the GS-14 level." She also stated that she did "not know how to fill out the justification form." Dr. Nickels did not dispute Dr. Damadio's contention that her duties had grown substantially. Dr. Nickels took no action on her request for a promotion for

approximately two years.

24. As time passed without Dr. Nickels taking any action on Dr. Damadio's reclassification request, Dr. Nickels told Dr. Damadio that the only way to get a promotion would be for her to leave her job because "you don't get promoted in place in the federal government." During the same period that it had supposedly not been the "right time" to pursue a GS-14 for Plaintiff, Dr. Nickels actively initiated, supported and secured accretion of duties reclassifications for two other comparable white male employees, Richard Brook and John Douglas. This undermines Dr. Nickels' claims concerning the "timing" not being "right" and the difficulty of promotion via accretion at the GS-14 level.

25. During this period, Dr. Nickels also sought and secured three new hires of other comparable program leads in Dr. Damadio's unit at the GS-14 level, as well as completing a GS-13 hire which gave an existing employee a grade promotion. None of these individuals were Hispanic.

26. In several conversations including, August 20, 2002 and September 11, 2002, Dr. Damadio inquired as to the possibility of obtaining a temporary GS-14 while her position reclassification was being processed. Dr. Nickels informed her

that, "No, they never give temporary promotions," and "I have never found an ability to get anyone to do that." In fact, Dr. Nickels had requested and obtained a temporary GS-14 promotion for Richard Brook, a white male in WO 240, while his reclassification was in process. Not only had Dr. Nickels obtained a discretionary temporary GS-14 for him, but when the 120 days was ending she wanted to extend it, saying that she was "deeply concerned," that "...this is a fairness issue," and that "...the implications for his morale are enormous." Human Resources provided Dr. Nickels with four options for additional funding until his promotion was finalized.

27. All members of Dr. Damadio's organizational unit had different areas of expertise and were nationwide Bureau leads in their individual specialties. Each member held a different but comparable position. Dr. Damadio was the only Hispanic in the Group (WO-240) supervised by Dr. Nickels. All the employees who were hired into or promoted into GS-14 positions during this period were non-Hispanic. Dr. Damadio was the only comparable employee who was not promoted to the GS-14 level by Dr. Nickels.

28. Three years elapsed without any action being taken by Dr. Nickels regarding the Plaintiff's reclassification. The issue of Plaintiff's reclassification arose during a conversation

involving Ms. Nickel's supervisor, Bob Abbey who was serving as
the Acting Assistant Director for WO 200, Mike Poole, the BLM
California State Director, and Dr. Damadio.  Mr. Abbey was so
convinced that Plaintiff's work performance was at the GS-14
level, that he took the unprecedented step of raising the
request for reclassification above Dr. Nickel's level to his
level.  At the request of Mr. Abbey, Dr. Damadio prepared an
accurate position description describing her actual duties.

29.  On September 20, 2002, Mr. Abbey's request for the
reclassification of Dr. Damadio's position was submitted to the
Bureau's Washington, D.C. HR Office for consideration for an
accretion of duties promotion for Dr. Damadio.  The transmittal
memo stated that, " ... the proper classification of this
position is long overdue as the incumbent has been performing
the higher level duties for well over three years.  Not only
will this action properly classify the duties of this position,
but will also put the incumbent in line with her peers."

30.  The unfortunate result of this initiative by Mr. Abbey
to advance Dr. Damadio's reclassification was that Dr. Nickels
became increasingly hostile towards Plaintiff.  This hostility
was manifested in numerous emails and telephone calls.  Dr.
Nickels called Dr. Damadio at home, while she was on sick leave,

14

leaving an accusatory voice mail threatening that Dr. Damadio would be receiving a letter of counseling as a result of speaking with Mr. Abbey.  Dr. Nickels also initiated a series of abusive calls and emails which continued for days claiming that Dr. Damadio's communication with Mr. Abbey and his subsequent initiative to advance Dr. Damadio's reclassification were "improper" and that she "was not obligated to move this forward except through the process."

31.  Dr. Damadio specifically and directly informed Dr. Nickels that she felt compelled to seek assistance to resolve issues elsewhere in the Agency. On November 2, 2002 in an email Dr. Damadio stated that she had been "...seeking helpful information from personnel, EEO, colleagues etc."  On November 12, 2002, without ever having spoken with Mr. Abbey or Mr. Pool regarding their meeting with Dr. Damadio, Dr. Nickels issued a Letter of Counseling to Dr. Damadio alleging that, by raising this reclassification issue with Mr. Abbey, she had circumvented the chain of authority.

32.  Beginning in November 2002, Mary Smelcer served a 30 day detail as Acting Deputy Assistant Director 200.  On December 13, 2002, her final day of the 30-day detail, Mary Smelcer pulled the reclassification package back from Human Resources before

any action was taken.  She sent the package to Dr. Nickels, who took no further action.

33.  On December 16, 2002, Dr. Damadio received a highly inappropriate and intimidating phone call from Ms. Smelcer.  Ms. Smelcer had never seen Dr. Damadio's position description and she and Dr. Damadio had never spoken.  Ms. Smelcer informed Dr. Nickels she was going to call Damadio about the "tension between you".  The conversation with Ms. Smelcer included phrases such as "it is really important that you watch your steps in this process...you are really pushing the envelope," and " I am sure that is not the way the AD said it."  It was not until the end of the conversation Dr. Damadio was made aware that Smelcer was no longer part of the Washington Office, or in Dr. Damadio's line of authority, but in fact had returned to her permanent job as Assistant District Manager, Medford, Oregon.

34.  No progress on reclassification of Plaintiff's position was made until after Dr. Damadio filed her first EEO complaint.  Within days of learning that Dr. Damadio had filed an EEO complaint, Dr. Nickels sent an email to Dr. Damadio dated March 6, 2003.  In her email Dr. Nickels stated she had delivered a request for accretion of duties promotion for Dr. Damadio's position to Washington Office Personnel which was "responsive

16

to the direction I received from Marilyn Johnson and Connie Stewart (WO Personnel) ...yesterday,". Dr. Damadio was informed that processing the request would require approximately six weeks to complete.  The complete package for an accretion of duties promotion for Dr. Damadio was identical in substance to the one submitted by Mr. Abbey.

35. From the time Mr. Abbey first submitted the reclassification package for Dr. Damadio's position several BLM Washington Office Human Resources (WO 700) employees were actively involved in supplying incomplete or incorrect information to Bureau staff, obstructing Dr. Damadio's promotion, and departing from correct procedures to delay and frustrate efforts to address and process the reclassification of Dr. Damadio's position. Human Resources employees would not have processed anything unless a senior manager made inquiries. These same employees claimed to have had conversations that did not take place, made pronouncements that were intimidating (e.g., if the classification was appealed to OPM, it would probably be denied) or were factually incorrect (e.g., the Director of the Smithsonian's American Indian Museum is a GS-14 therefore Dr. Damadio's position could not be a GS-14; the Director is not in fact a GS employee).

17

### Reclassification Decision Based on Wrong Standards

36. Evaluation of the reclassification of Plaintiff's position was assigned to George Scott, a contract employee working for the Agency. The classification analysis by Mr. Scott was based on an application of incorrect position classification standards, resulting in inappropriate criteria that fatally flawed the classification process. Mr. Scott erroneously applied position classification standards for Historian positions to the position, rather than the applicable Museum Curator standards.

37. In a Position Evaluation Statement dated April 16, 2003, Mr. Scott, concluded that the position description was at the GS-13 level. It also stated that the Museum Curator Series "does not contain grade-level criteria," which is inaccurate. Other reasons for the assignment of a GS-13 level were that Dr. Damadio did not testify before Congress (no GS-14 or GS-15 in Dr. Damadio's unit had testified before Congress nor had 99% of Agency's GS-14, GS-15, or Senior Executive Service managers *ever* testified before Congress). Another reason was that Dr. Damadio was three levels below the Director (which all GS-14 and many GS-15 positions are in the Agency).

38. By Memorandum dated April 30, 2003, Concetta Stewart, Acting

18

Assistant Director, HR Management, relying upon this flawed analysis, determined that the final allocation of Dr. Damadio's position would be at the GS-13 level.  Dr. Damadio had not received the memorandum when she was called by her supervisor, who offhandedly informed Dr. Damadio that the position was reclassified as a GS-13 and said, "Sorry, that's just the way it came out."  Dr. Damadio noted the flaws in the reclassification but was told that in a meeting on May 19, 2003, Human Resources said there was no reason to address her concerns, and that they would let Dr. Damadio appeal the classification.  On June 10, 2003, less than a month after the final allocation, Dr. Damadio was informed by her supervisor that Human Resources had directed Dr. Nickels to enter the GS-13 reclassification into the Federal Personnel and Payroll System.

## Beginning of Hostile Work Environment

39.  Since Dr. Damadio began to regularly inquire about a reclassification, she was subjected to a hostile work environment by Dr. Nickels.  Dr. Nickels engaged in a deliberate campaign of false and disingenuous statements in order to undermine Dr. Damadio's professional reputation and her effectiveness in her position.  She made deliberate false statements to individuals with whom Dr. Damadio worked regularly to bias or prejudice these

managers and colleagues against Dr. Damadio.  Dr. Damadio was marginalized, kept from receiving critical information in a timely fashion, and accused of having frivolous or unprofessional for her actions or requests.

40.  In all conversations involving Dr. Nickels, she exhibited an *a priori* presumption of wrongdoing on Dr. Damadio's part. Communication between Dr. Nickels and Dr. Damadio became strained and unproductive.  The funding for Dr. Damadio's portions of the program were zeroed out by Dr. Nickels' actions without regard for the impact of these funding decisions.

41.  Viewed separately and individually, it might be possible to conclude that some of these incidents were the results of mistakes, forgetfulness, or that a lack of professionalism, and general incompetence could have played a part.  However, considering the when the sheer number of incidents, along with the presence of inappropriate and illegal actions, there is ample evidence for a pattern of discriminatory treatment.

42.  On numerous occasions, including August 15, 2002, Dr. Damadio told Dr. Nickels that her actions were marginalizing Plaintiff's position and negatively impacting her effectiveness. Dr. Nickels responded that "for the record, it is the penalty for not being here" (in Washington, D.C.).  Yet when the BLM Director

made the decision in 1996 for Dr. Damadio to be duty stationed in California, it was based on the needs of the Bureau. Certainly there was no mention or intimation of a "penalty," nor would such a concept be consistent with sound management practice. There are over fifty (50) other similarly situated BLM WO employees whose duty stations are in the field and none of them suffers this "penalty." Most of these employees are at either GS-14 or GS-15 level.

43. On countless occasions, Dr. Damadio was intentionally excluded from meetings within her area of program responsibility. Due to the time difference, Dr. Damadio often arrived at the office as early as 5:30 a.m. to be on a conference call originating in Washington, D.C. only to not be called or having to call a third party to connect her to the office where the meeting was already in progress. When asked about these exclusions, Dr. Nickels offered excuses such as "We had to move the meeting to tomorrow. I thought I had let you know,"or "It was my oversight that Stephanie was not in attendance by phone," or "I forgot you were going to be on the call."

44. On September 16, 2002, Dr. Nickels made unfounded and highly prejudical comments concerning Dr. Damadio's ability to get along with other employees. Her remarks occurred during a meeting in

Shasta City, California, that Dr. Nickels, Robin Burgess (a then
new member of WO 240, hired in July 2002) and the BLM California
State Archaeologist Russell Kaldenberg were attending.  During the
meeting Ms. Burgess asked Mr. Kaldenberg, "how do you get along
with Stephanie?"  Mr. Kaldenberg replied he got along great with
Dr. Damadio.  Dr. Nickels asked him, in front of Ms. Burgess,
"Didn't you have a problem when Stephanie first came to
California?"  Mr. Kaldenberg replied that he never had any problem
with her and that she was very responsive and helpful.

45.  Beginning as early as August 15, 2002, and in subsequent
phone calls during August 2002 with Dr. Nickels regarding the
contents of an email dated August 14, 2002, Dr. Damadio stated that
based on her comments and actions, it was clear Dr. Nickels did not
accept Dr. Damadio as an outgoing, professional, Hispanic woman.
The Plaintiff expressed that she believed she had been subjected to
a hostile work environment for some months at that point.

### Non-Selection for Group Manager GS-0301-14/15 Position

46.  Dr. Damadio was subjected to a non-selection on the
basis of her race and national origin (Hispanic) and prior EEO
activity for the position advertised in Bureau Vacancy
Announcement Number WO-04-12, Group Manager, GS-0301-14/15. The

22

vacancy was located in Washington, D.C.

47. Dr. Damadio submitted a timely application for the vacancy on March 22, 2004. Her application contained a seven page resume, a seven page narrative assessment of her qualifications in a Knowledge, Skills, and Abilities Statement and her most recent performance appraisal (2003).

48. Based on her education, teaching experience, management experience, and her extensive work in the relevant disciplines, Dr. Damadio was well-suited to all of the KSAs as set forth in the vacancy announcement. Dr. Damadio was deemed qualified based on the initial review of her credentials based on her educational background and her array of relevant work experience. In the initial selection process, Dr. Damadio was given a rating of 39. The eventual selectee was given a 35.

49. Plaintiff's name was forwarded to an interview panel consisting of Mr. Thomas Dyer (white, male, aware of Plaintiff's prior EEO activities) and Mary Trautner (American Indian, female, aware of Plaintiff's prior EEO activities). The interview panel was instructed by the selecting official, Ed Shepard, (American, white, male, aware of Plaintiff's prior EEO activities), Assistant Director, Renewable Resources Planning, Washington, D.C., to forward only three candidates to him for

23

final consideration. There is no legitimate basis for this arbitrary limitation on the number of names to be forwarded.

50. The interview panel stated that they chose to recommend the eventual selectee instead of Dr. Damadio to the deciding official because they were seeking a manager rather than a technical expert. This alleged justification is puzzling, since Dr. Damadio had not only served in the Bureau in a technical supervisory position, providing oversight and conveying assignments on a continuing, permanent basis more than twice as long as Ms. McClellan (12 years vs. 4 years), but had managed individuals of varied ages, educations, and cultures worldwide using other languages during her fieldwork and in her Smithsonian career.

51. Inexplicably, the interview panel decided to base their rating of the candidates on factors other than the established KSAs identified in the Bureau Vacancy Announcement Number WO-04-12. The interview panel members have suggested in their depositions that they decided which three candidates to forward to the selecting official based on their subjective impression of the people skills of each candidate based solely on their 20 to 30 minute interview. The interview panel forwarded only three names to Mr. Shepard. Despite her stellar

credentials Plaintiff's name was not forwarded to Mr. Shepard.

52.  The final selection was made by Mr. Shepard from the three names that were forwarded to him.  His involvement in narrowing the pool of candidates before this point is unclear, apart from his admission that he directed the interview panel to forward only three candidates to him for final consideration. The selectee for the vacancy was Ms. Carolyn McClellan (American Indian, female, aware of Plaintiff's prior EEO activities).  The selectee has been the subject of EEO complaints in the past, which was known to the individuals on the interview panel and to the selecting official, another fact which does not sit well with the avowed interest of the interview panel in selecting a manager with people skills.

53.  The selectee is an American Indian female and the complainant is an Hispanic female. The selectee's credentials were significantly less robust and impressive than those of Dr. Damadio.  Dr. Damadio's resume was obviously superior to that of the selectee as measured by the applicable KSAs from the vacancy announcement.

54.  Leading, coordinating, and developing the policies of cultural and fossil resources and tribal consultation programs is a core responsibility of the vacancy. Dr. Damadio had

authored all national policy regarding NAGPRA and Museum
Collections, served as an advisor to the National Indian Justice
Center, and authored the Bureau's comments on the regulations
of the Native American Graves Protection and Repatriation Act
and the Indian Self-Determination Act governing negotiated rule-
making with tribes.  Ms. McClellan had never been responsible
for creating consultation programs nor had she headed up any
nationwide fossil program.

55.  Having demonstrable ability and knowledge in leading,
coordinating and performing analyses and evaluation of cultural,
fossil and tribal consultation programs is a core responsibility
of the vacancy.  This requires specific knowledge of the
programs being administered by the Group Manager - archaeology,
paleontology, history, historic preservation, Native American
issues, physical and cultural anthropology, NAGPRA, heritage
education, public outreach, all aspects of museum sciences and
extensive familiarity with relevant regulations and Bureau
policy.  Dr. Damadio had years of extensive experience and
knowledge of all of the program areas.  Ms. McClellan's resume
reveals no archaeology, historic preservation, history, heritage
education or paleontology experience or extensive knowledge of
applicable authorities and very limited germane experience in

26

the other areas.

56. Planning and organizing the work of an organization and directing the work of subordinates is one of the core responsibilities of the vacancy. Dr. Damadio had managed hundreds of employees nationwide on a permanent basis for 12 years as well as creating and administering the Bureau's Museum Partnership Program, which developed, reviewed, and approved scientific projects for the allocation of grants. Dr. Damadio had been in professional government service for over 20 years in directly related job experience. Ms. McClellan had only been in professional government service for 5 years.

57. Actively promoting cooperation, teamwork, attaining objectives, making decisions, and exercising initiative on highly visible programs are all core responsibilities of the vacancy. Dr. Damadio has demonstrated her ability to perform all of these duties over her 12 years as a public servant in the Bureau and more than 13 years as a researcher and scientist at the Smithsonian Institution. Dr. Damadio has been employed by the Bureau continuously since 1994, giving her 12 years of service as an employee of the Bureau, while the selectee had never been employed by the Bureau prior to her selection.

58. Finally, Dr. Damadio achieved a doctorate-level

27

educational qualification in a field directly relevant to the work of the vacancy, while Ms. McClellan had no formal education beyond a Master's degree in cultural anthropology.

59. Based on the large disparity between the qualifications of Dr. Damadio and the selectee and Dr. Damadio's far superior experience in the Bureau and in the job duties of the announced position, her non-selection is baffling. There are two key differences between the selectee and Dr. Damadio. Initially, the selectee had never engaged in protected EEO activity involving the Bureau, and Plaintiff had. Secondly Plaintiff is only Hispanic in this division and the selectee is an American Indian.

## Continuation of Hostile Work Environment

60. On October 18, 2004, Carolyn McClellan was officially transferred from the Bureau of Indian Affairs and became Dr. Damadio's supervisor. Ms. McClellan engaged in a clear pattern of discriminatory treatment and harassment that included but was not limited to:

> A. Demanding leave slips for as little as 1 hour of leave from Dr. Damadio, despite the fact that no written or oral policy has of yet been provided to justify this demand, nor is it common

28

practice in the Bureau. Other members of the division were and had been permitted to be absent for as much as a week with only a phone call.

B. Demanding detailed medical information from Dr. Damadio, but not from a similarly situated individual, who had an operation during the same time period.

C. Sending Dr. Damadio "locked" emails, which do not allow printing, copying or forwarding of the email, in which work assignments and deadlines were contained and in which Dr. Damadio was berated and inaccurate assertions were made. No other employee reporting to Ms. McClellan had received locked emails.

D. Blind-copying or sending her correspondence to Dr. Damadio to be reviewed by others, which was not done with any other employees reporting to Ms. McClellan.

E. Little or no face-to-face or telephone communication with Dr. Damadio, amounting to less than 10 conversations in a calendar year, unlike the regular contacts Ms. McClellan had with other

employees reporting to her.

F. Utilizing the formal evaluation system to Dr. Damadio's detriment by allowing no input, and setting arbitrary and capricious performance standards that were not dependent solely on Dr. Damadio and were a de facto demotion, in a manner that is contrary to rule, regulation and policy.

G. Issuing Dr. Damadio a Letter of Counseling without inquiring into the facts of the situation or "counseling" Dr. Damadio.

61. On November 25, 2004, Dr. Damadio was admitted to the hospital with viral meningitis. Her physician initially recommended that she be put on medical leave until December 13, 2004.

62. Dr. Damadio's husband, Robert Laidlaw, an employee of the U.S. Department of the Interior, sent an email to her supervisor, Ms. McClellan, on November 29, 2004, informing Ms. McClellan of the nature of Dr. Damadio's illness, her expected recovery time frame and the fact her workload was covered, with copies to managers.

63. On December 1, 2004, Mr. Laidlaw faxed a physician's certificate of illness for Dr. Damadio to Ms. McClellan.  Mr.

Laidlaw also emailed a workload analysis for Dr. Damadio for her proposed period of absence as demanded by Ms. McClellan.

64.    On December 6, 2004, against her physician's advice, Dr. Damadio came to work to submit her leave slip and completed time card as demanded by Ms McClellan.

65.    On December 7, 2004, Dr. Damadio gave a teleconference presentation to over fifteen Bureau employees in which she discussed her workload for the immediate future. Ms. McClellan was present for this presentation.

66.    On December 10, 2004, Dr. Damadio was harassed when she received an undated letter from Ms. McClellan at home that was not on Bureau letterhead demanding that she complete and return a Request for Leave, on pain of the leave not being approved. The letter also requested immediate consultation with Dr. Damadio for the purposes of discussing her existing workload, the same workload that was the subject of the December 1, 2004 email and December 7, 2004 presentation.

67.    On December 15, 2004, Dr. Damadio informed her supervisor, Ms. McClellan, that her physician was not satisfied with her recovery and that she would be submitting an additional request for leave until January 16, 2005. This leave request was approved by Ms. McClellan.

31

68.   During this time, Dr. Damadio continued to work on a number of tasks relating to ongoing legal action involving the Bureau.  This was the maximum work permitted under her doctor's orders.  Dr. Damadio was on certified medical leave in December, 2004 and January 2005, as the result of viral meningitis and the stress induced by her supervisor regarding her medical leave, but worked numerous hours to assist the Bureau and the Solicitor meet a judicially mandated deadline for products that only she could produce.  Bureau officials were fully aware of her illness and her work.  She received a letter of commendation from a Regional Solicitor for her excellent and timely work during this period.

69.   At no point did Dr. Damadio ask for any special accommodation in keeping up with her assigned workload.

70.   On December 23, 2004, without informing Dr. Damadio, Ms. McClellan altered Dr. Damadio's time sheet in order to charge her sick leave for the entire pay period from December 13 to December 22, 2003, despite the fact that Dr. Damadio had been demonstrably working on assigned Agency duties and had only requested and actually taken 18 hours of sick leave during that period. Dr. Damadio had also requested that these 18 hours of sick leave be charged to her annual leave (025 - annual in lieu

of sick leave) rather than to her sick leave.

71.  Instead of being charged 18 hours of annual leave in lieu of sick leave, Ms. McClellan charged Dr. Damadio 65 hours of sick leave.  Ms. McClellan did not inform Plaintiff of this change to her recorded leave on the final time sheets.

72.  On January 10, 2005, Ms. McClellan once again unilaterally changed Dr. Damadio's annual leave to sick leave. She erroneously charged Dr. Damadio with 72 hours of sick leave.

73.  In a letter dated January 10, 2005, and sent by FedEx to Dr. Damadio's home and work, Ms. McClellan claims that the three pieces of medical documentation thus far submitted by Dr. Damadio are inadequate for the purposes of determining eligibility for sick leave.  The letter demands that Dr. Damadio immediately provide additional documentation regarding the precise clinical diagnosis of her condition and the results of any diagnostic tests that had been performed, the specific prognosis for her condition, the expected date of return to full duty, the identification of any and all medications, along with dosages, that she was taking and accommodations she required in order to return to full duty.  Dr. Damadio was given a deadline of January 18, 2005, to provide this information, a profoundly unrealistic deadline as Dr. Damadio was on leave until January

33

17, 2005.

74.  On January 18, 2005, Dr. Damadio emailed Ms. McClellan reminding her that she was not requesting any accommodation or planning to take any sick leave that had not already been approved.  She also reminded Ms. McClellan that she was back in the office, not at home.

75.  Ms. McClellan's alteration of Dr. Damadio's time card without her knowledge, in contravention of applicable law, regulation, and policy, resulted in the loss of approximately $5,000 in pay and benefits.

76.  On January 26, 2005, Ms. McClellan sent another letter to Dr. Damadio reiterating her demand for medical documentation for the period of sick leave which had already been approved. The letter did not acknowledge the email of January 18, 2005, from Dr. Damadio.

77.  A similarly situated employee reporting to Ms. McClellan, Mr. Dan Martin, was absent for two weeks for surgery related to cancer. He was never asked for a physician's certificate or any documentation. Mr. Martin voluntarily submitted a sick leave slip, but in email communication with Dr. Damadio he claimed that no additional information had been requested.

34

78. On January 26, 2005, Ms. McClellan completed an Employee Performance Appraisal Plan (EPAP) for Dr. Damadio. This plan incorporated none of the input that Dr. Damadio had submitted for it, contained products and deadlines that were not solely dependent on Dr. Damadio, and drastically revised and incorrectly reduced Dr. Damadio's assigned responsibilities, effectively demoting her in position. In direct contrast, Ms. McClellan adopted the EPAP input by the other employees of the group with only minor edits.

79. On or about January 27, 2005, a similarly situated employee, Richard Brook, informed Dr. Damadio that he had sustained water damage to his home in San Diego, California, and traveled to assist with repairs. Mr. Brook was absent from the office for a week. He entered the time on his time sheet when he returned.

80. Mr. Brook claimed that he had only called Ms. McClellan to inform her that he was flying to California. Mr. Brook claimed that Ms. McClellan had not requested a leave slip or documentation of any kind. No disciplinary action or counseling was taken against Mr. Brook as a result of this incident.

81. In memos dated February 14, 2005, and March 17, 2005,

Dr. Damadio requested correction of the erroneous adjustments Ms. McClellan made to her sick leave. Ms. McClellan issued an undated memo acknowledging receipt of these memoranda, but made no effort to correct her errors.

82. On April 18, 2005, while on approved annual leave, Dr. Damadio, at the request of Mr. Jim Hughes, the Bureau's Deputy Director for Policy and three levels above Dr. Damadio in her line of authority, attended a meeting in the Main Interior Building to act as the Bureau's representative in a discussion of a proposed amendment to the Native American Graves Protection and Repatriation Act. At the time that Dr. Damadio was asked to attend the meeting, Ms. McClellan was on vacation in Hawaii.

83. On May 16, 2005, Dr. Damadio received a Letter of Counseling from Ms. McClellan chastising her for not informing Ms. McClellan of the meeting or her intention to act as a representative there. Disciplinary action was threatened if a similar event occurred in the future.

84. The Letter of Counseling also chastised Dr. Damadio for allegedly misrepresenting the Bureau's position in the meeting she attended at the request of Mr. Hughes. In fact, Dr. Damadio simply represented the position presented in Mr. Hughes' own March 30, 2005 Memorandum to the head of the Department of

the Interior's Office of Congressional and Legislative Affairs. Given that she was instructed to attend the meeting by Mr. Hughes, Dr. Damadio was in fact obligated to present the official position of the Deputy Director of Policy, regardless of whether or not Ms. McClellan personally agreed with it.

85. Dr. Damadio was forced to request a transfer to the California Bureau State Office to a position with no possibility of promotion in order to escape the intolerable hostile work environment created by Ms. McClellan and tolerated by the Bureau. Dr. Damadio's transfer became effective October 16, 2005.

86. Despite repeated emails and telephone calls to those above her in the chain of command sharing her concerns about Ms. McClellan's harassment of her and requesting relief, Bureau officials never took action to address Ms. McClellan's hostile and discriminatory treatment of Dr. Damadio. The management officials who were contacted regarding the hostile work environment yet took no action to address it include Ms. Mary Trautner, Mr. Tom Dyer, and Mr. Ed Shepard, Ms Selma Sierra, Mr. Jim Hughes, Ms Marilyn Johnson, Mr. Larry Benna, Mr. Fran Cherry and Bureau Director Kathleen Clark.

87. On August 18, 2005, Dr. Damadio faxed a medical

certificate from Dr. Stephen Curtin, a licensed psychologist, to Ms. McClellan, stating that Dr. Damadio was suffering from Acute Stress Disorder. The certificate stated that Dr. Damadio would not be able to return to work until September 6, 2005, and would in the meantime require extensive treatment. Dr. Damadio faxed a Request for Leave or Approved Absence to Ms. McClellan on the same day, requesting the use of annual leave in lieu of sick leave from August 8, 2005 until September 5, 2005.

88. In a letter dated August 22, 2005, Ms. McClellan refused to accept Dr. Curtin's certification of Dr. Damadio's condition or approve the leave requested, upbraided her for her failure to complete an assignment (that had in fact been completed) because of her condition and demanded that Dr. Damadio have Dr. Curtin answer a series of questions about Dr. Damadio's diagnosis.

89. In the letter of August 22, 2005, Ms. McClellan also demanded a medical release form from Dr. Damadio if she did not want to provide the list of questions to Dr. Curtin, with the explicit and express purpose of allowing Ms. McClellan to interrogate Dr. Curtin concerning Dr. Damadio's condition. Ms. McClellan threatened Dr. Damadio with AWOL status if she did not provide either form, an unconscionable and egregious invasion

38

of Dr. Damadio's medical privacy.

90. Ms. McClellan claims in an email dated September 9, 2005, that she sent not just one copy of the letter of August 22, 2005, to Dr. Damadio, but three copies. One copy was allegedly sent by express mail, one was sent by certified mail, and one was sent by regular mail. This bizarre choice of postal options is in no way required by Bureau policy nor does it appear to serve any legitimate management purpose or any purpose other than harassment.

91. In the same email of September 9, 2005, Ms. McClellan informed Dr. Damadio that since she had not responded to the letter of August 22, 2005, within a period of three days, she was being placed on AWOL. Ms. McClellan also declared that because the initial leave slip that was not approved did not explicitly invoke the Family and Medical Leave Act, it could not possibly cover Dr. Damadio's absence for treatment for Acute Stress Disorder. Ms. McClellan's decision and declaration were entirely arbitrary and have no support in applicable Bureau regulations, applicable Office of Personnel Management regulations, or the Family and Medical Leave Act itself.

92. On September 14, 2005, Dr. Damadio was contacted by Mr. Jim Smith, a contractor working as an EEO investigator for

the Bureau. The call occurred more than 195 days after Dr. Damadio's complaint had been filed. Dr. Damadio had already decided to request a hearing before the EEOC, since she had not timely received a copy of the informal counseling report or a final acceptance letter from the EEO.

93. Dr. Damadio explained these procedural facts to Mr. Smith, but he insisted that she would have to cooperate with his inquiries because he had a mandate from the Secretary of the Interior. He demanded that she attend an interview of which she had received notice via mail only one day before the scheduled date. Dr. Damadio declined to consent to this unreasonable demand.

94. In its Final Decision letter regarding her complaint of March 4, 2005, the Bureau cited this refusal to consent to an unreasonable interview as a primary factor in dismissing her complaint.

95. In a November 16, 2005, note attached to Dr. Damadio's erroneous Employee Performance Appraisal Plan, Ms. McClellan calls Plaintiff's medical condition "questionable," despite having personally received certification of the diagnosis and serious nature of her condition (Acute Stress Disorder). Such a characterization of Dr. Damadio's condition, entered as it was

40

into her permanent personnel file, was pejorative and served no legitimate management purpose.

96. Dr. Damadio was forced to attempt to alleviate the hostile work environment and thus alleviate serious medical problems by suggesting to Mr. Ed Shepard in a memorandum on September 26, 2005, that she be permitted to report to the Agency's California State Office. This change of reporting allowed Dr. Damadio to avoid constant interaction with Ms. McClellan at the expense of any prospect of advancement within the Bureau.

97. The Agency's California State Office Director, Mr. Mike Pool agreed to the reassignment, and Mr. Ed Shepard eventually allowed the reassignment to take place, effective October 16, 2005. In his sworn affidavit in Dr. Damadio's EEO case, Mr. Shepard stated that the reassignment was made to address "tensions" between Dr. Damadio and Ms. McClellan, which constitutes a tacit acknowledgment on his part that he was aware of the hostile work environment at that time. He offered no explanation as to why he did not address this problem earlier.

98. Agency Representative Jacqueline Jackson involved herself inappropriately in the investigative portion of the March 4, 2005 complaint (Agency Case No. LLM-05-016). Ms.

Jackson directly contacted witnesses involved in the case and insisted on being present while witnesses gave statements. This is in violation of MD 110, Ch. 1, Sec. III.

## Harms to Plaintiff

99.  The harms that Ms. Damadio has suffered to her career and future employment prospects are significant, she has been prevented from advancing beyond the GS-13 level for 12 years, a serious impairment of her expected rate of advancement.  She is the only Hispanic in her division and the similarly situated white males have all been promoted.

100.    Ms. Damadio has suffered a direct loss of $4,917 as a result of Ms. McClellan's erroneous causing her time at work to be entered as annual leave.  Furthermore, Ms. Damadio has lost an additional 119 hours of sick leave as a result of Ms. McClellan's unilateral mismanagement of her leave requests.

101.    Ms. McClellan's harassment of Ms. Damadio seriously exacerbated her poor health as a result of viral meningitis and substantially slowed her recovery.

102.    Ms. McClellan's harassment of Ms. Damadio substantially contributed to her developing Acute Stress Disorder, seriously impairing her ability to work and enjoy life and requiring extensive psychological treatment.

103.    The Employee Performance Appraisal Plan under which Ms. Damadio now worked was inconsistent with her position description and constituted an effective demotion in position.

## CAUSES OF ACTION

### Count I

### Denial of Promotion By Accretion of Duties
### Based on Race National Origin and Gender

104.    Based upon the facts described in the preceding paragraphs, Defendant unlawfully discriminated against Plaintiff Stephanie Damadio because of her race and national origin (Hispanic) and gender (female) by failing to promote her via accretion of duties from the GS-13 to the GS-14 level in the period 1999-2004, in violation of the Civil Rights Act of 1964, as amended, U.S.C. § 2000e, et seq.

### Count II

### Non-Selection for Group Manager Vacancy
### Based on Race and National Origin

105.    Based upon the facts described in the preceding paragraphs, Defendant unlawfully discriminated against Plaintiff Stephanie Damadio because of her race and national origin (Hispanic)by non-selecting her for the position advertised in Bureau Vacancy Announcement Number WO-04-12, Group Manager, GS-

43

0301-14/15 in violation of the Civil Rights Act of 1964, as amended, U.S.C. § 2000e, et seq.

### Count III

### Retaliation Based on Protected EEO Activity

106.    Based upon the facts presented in the preceding paragraphs, Defendant unlawfully retaliated against Plaintiff Stephanie Damadio on the basis of her prior protected activity by failing to promote her via accretion of duties to a GS-14 position, by non-selecting her for the position advertised in Bureau Vacancy Announcement Number WO-04-12, Group Manager, GS-0301-14/15, and subjecting her to a hostile work environment beginning in 1999, in violation of the Civil Rights Act of 1964, as amended, U.S.C. § 2000e, et seq.

### Count IV

### Hostile Work Environment

107.    Based upon the facts presented in the preceding paragraphs, beginning in 1999, the Defendant unlawfully discriminated against Plaintiff Stephanie Damadio because of her race and national origin (Hispanic) and gender (female) by subjecting her to a hostile work environment, in violation of the Civil Rights Act of 1964, as amended, U.S.C. § 2000e, et

seq.

## Count V

### Denial of Leave and Failure to Accurately Credit Time Worked

108.    Based upon the facts presented in the preceding paragraphs, beginning in 2004, the Defendant, acting through Ms. McClellan, unlawfully discriminated against Plaintiff Stephanie Damadio because of her race and national origin (Hispanic) and gender (female) by unlawfully denying her well-documented requests for leave while she was incapacitated and by deliberately failing to accurately record her time actually worked, thus depriving her of pay and benefits in violation of the Civil Rights Act of 1964, as amended, U.S.C. § 2000e, et seq.

### RELIEF REQUESTED

109.    Plaintiff requests any and all relief available under Title VII of the Civil Rights Act of 1964, as amended, U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981a, and civil rights law, including but not limited to the following:

      A.    Retroactive promotion to the position of Group Manager, GS-0301-14/15.

      B.    Full back pay and benefits commensurate with this position, with all applicable within-grade

increases and interest from the date of non-selection, September 22, 2004.

C.   Compensatory damages in the amount of $155,000 based on appropriate proof at trial.

D.   Removal of the Letters of Counseling of November 12, 2002 and May 16, 2005 from Plaintiff's personnel file and expungement of all references to such documents in the Agency's files.

E.   The reasonable attorneys' fees, at the <u>Laffey</u> prevailing market rates, and costs and expenses of bringing this case.

## JURY TRIAL

110.   Plaintiff requests a trial by jury on all issues that are triable by jury.

CHARLES W. DAY, JR.
(DC Bar No. 459820)
MYRREL C. HENDRICKS, JR.
(Admitted in D.C.)
GEBHARDT & ASSOCIATES, LLP,
1101 17th Street, N.W., Suite 807
Washington, DC 20036-4716
(202) 496-0400

August 25, 2006          Attorneys for Plaintiff

46